[No. 10571. Department Two. November 25, 1913.]

ELMIRA NOYES, *Appellant*, v. ROBERT D. ADAMS, *Respondent*.[1]

GUARANTY—PERFORMANCE OF CONTRACT. A written guaranty to deliver certain notes and collateral is not substantially complied with unless all the notes correctly described therein are delivered.

GUARANTY—CONSIDERATION. The personal guaranty of the vice president of a trust company to deliver certain notes and collateral is founded on a sufficient consideration, where on the faith of the promise money was paid to the trust company; since a detriment to the promisee is as much a consideration as is a benefit to the promisor.

GUARANTY—BREACH — PARTIAL PERFORMANCE — MEASURE OF DAMAGES. In an action for damages for breach of a contract of guaranty, whereby, in consideration of $15,000, the defendant promised to deliver certain notes and collateral, and forbear on other claims, the measure of damages is the actual losses sustained, and not the return of the entire sum advanced, where the contract had been partially performed by delivering the greater part of the notes and collateral described and by granting the forbearance.

DAMAGES—FAILURE OF PROOF—NOMINAL DAMAGES. In an action for damages for breach of a contract of guaranty, failure to prove substantial damages is failure to prove the substance of the issue, entitling defendant to judgment; hence it is not reversible error to fail to give nominal damages on proof of a partial breach resulting in no actual loss.

Appeal from a judgment of the superior court for King county, Myers, J., entered January 15, 1912, upon findings in favor of the defendant, in an action for breach of contract, tried to the court. Affirmed.

*Ralph R. Duniway* and *James G. Raley*, for appellant.

*Hughes, McMicken, Dovell & Ramsey*, for respondent.

FULLERTON, J.—The appellant, plaintiff below, brought this action against the respondent to recover damages in the sum of $15,000, alleged in the complaint to have been suf-

[1]Reported in 136 Pac. 696.

fered by her because of the failure of the respondent to comply with the terms of a written guaranty. Issue was taken on the complaint, and a trial had before the court sitting without a jury, which resulted in findings and a judgment in favor of the respondent.

The principal facts giving rise to the controversy are not seriously in dispute. From the record it appears that, in the year 1909, and for some years prior thereto, the Candle Alaska Hydraulic Gold Mining Company, a corporation, owned and controlled extensive placer mining properties, situated near Candle, Alaska, in the development of which it had expended large sums of money, and incurred a large indebtedness. Its principal stockholder was T. C. Noyes, a son of the appellant, who it seems had furnished the corporation with the principal part of the money with which its properties were acquired. The appellant was also a stockholder in the concern in a limited amount, and was also its creditor in a considerable sum, the precise amount not appearing in the record.

During the course of its operations, the corporation became largely indebted to the Nome Bank & Trust Company, a banking corporation, doing business at Nome, Alaska. In the fall of the year 1908, this indebtedness was represented by promissory notes as follows: A note for $25,000, secured by a mortgage upon the real and personal property of the corporation; a note for $5,000, secured by 10,000 shares of the stock of the corporation; a note for $2,924.60, secured by 6,000 shares of such stock; and a note for $1,000, secured by 5,000 shares of such stock. The bank also held, at the same time, the individual note of T. C. Noyes for $2,000, secured by 25 shares of the corporation's capital stock; the note of T. C. Noyes and Frances Noyes for $3,000, secured by 12,000 shares of such stock; and a note of the T. C. Noyes Banking Company, a banking concern managed by T. C. Noyes, for $2,994, secured by 12,000 shares of such capital stock. These notes were then all overdue, and the

bank seemingly was not easy concerning them, especially the notes secured by pledges of the corporation's capital stock; but Noyes was either unwilling or unable to meet them, and left Nome before the close of navigation in 1908 without arranging for their payment.

The respondent Adams was vice president of the Nome Bank & Trust Company in the years 1908 and 1909, although he testifies he had nothing to do with its immediate management. He left Nome, also, before navigation closed in 1908, going to the state of California. In the early part of the year 1909, a representative of the Nome bank cabled him at San Francisco to take up the matter of the Noyes' indebtedness to the bank with Noyes, and endeavor to procure its settlement, directing him to notify Noyes that if the indebtedness was not taken care of the bank would attempt to realize on its collaterals. Noyes was also in San Francisco, and Adams communicated with him concerning the matter. The record does not make clear what Noyes had done in that behalf, but it appears that he had been endeavoring to raise money for his mining adventures; and some days after Adams had communicated with him, he showed Adams the following telegram received from his mother, the appellant, who was then in New York City: "Possibility of making arrangement here. Prepare to come East. Will telegraph Monday. Think it wise to have Adams come with you."

Shortly thereafter, Noyes and Adams left for New York, reaching there in the early part of May, 1909. The matter of the indebtedness to the Nome bank was at once broached between Adams, T. C. Noyes, and the appellant; and pending the negotiations, a cablegram was sent to Noyes by the Nome bank purporting to describe the obligations due to the bank from Noyes personally and from the different concerns which he represented. This cablegram was sent in cipher, and was translated by Noyes with the aid of one Meyer, and a copy of the translation given to Adams. After

some negotiation, the appellant agreed to take up these
obligations to the amount of $15,000, provided they were
assigned to her with their collaterals and the immediate pay-
ment of the balance not enforced. Adams agreed to these
conditions on the part of the bank. It was understood by
Adams at that time that these notes and collaterals were in
the possession of the Nome bank's correspondent bank at
Seattle, and he so informed the appellant. She thereupon
wired her bank at Seattle to turn over to the correspondent
bank $15,000 and take over certain described notes with
their collaterals. The Seattle bank informed her shortly
thereafter that no such notes and collaterals as she described
were with the correspondent bank, and she so informed
Adams. Adams thereupon agreed with her that if she would
let the $15,000 go to the credit of the Nome bank, he would
undertake personally to see that the notes and collaterals
described would be turned over to her as soon as navigation
opened with Nome during the coming summer. She agreed
to this and directed her bank to turn the money over uncon-
ditionally. Adams thereupon gave her the following writing:

"May 21st, 1909.

"To Mrs. Elmira Noyes: In consideration of the fact
that certain notes and securities which were believed to be
in the hands of Scandinavian American Bank and which are
now found to be in possession of Nome Bank & Trust Co., I
hereby guarantee personally that the following notes and at-
tached securities will be placed in Mrs. Noyes' hand on de-
mand. These notes and securities are as follows, viz.: Note
of $2,500 with Ditch Stock as security; Note of T. C. &
Frances Noyes of $3,000 with securities; Note of T. C. Noyes
Banking Co. for $2,900 with securities; Note of T. C. Noyes
personal for $2,000 with attached securities; and Note of
Candle A. H. G. M. Co. for $4,400 with attached securities.

"R. D. Adams,

"Vice Pres. Nome Bank & Trust Co."

On receipt of information that the money had been paid
to its use, the Nome bank credited it as follows:

"Note of the Candle Alaska Hydraulic Gold
   Mining Co. to the Nome bank............ $5,000.00
"Interest on same....................... 463.33
"Note of Candle Alaska Hydraulic Gold Min-
   ing Company ....................... $1,000.00
"Interest on same....................... 72.00
"Note of T. C. Noyes Banking Company..... $2,994.40
"Interest on same....................... 222.18
"Note of T. C. Noyes and Frances Noyes.... $3,000.00
"Interest on same....................... 503.65
"Overdraft Candle Alaska Hydraulic Gold Min-
   ing Company ....................... 408.95
"Overdraft of the T. C. Noyes banking com-
   pany ............................... 1,335.49
                                        ——————
"Total......................$15,000.00

This application of the fund was made on May 20, 1909,
and later the Nome bank, on behalf of Adams, proffered the
appellant the notes above mentioned with their collaterals,
the latter consisting of 27,000 shares of the capital stock of
the Candle Alaska Hydraulic Gold Mining Company. The
appellant refused to accept the same as a compliance with
the written guarantee above set forth, and brought the pres-
ent action as before stated.

By a comparison of the notes described in the written
guaranty and the notes tendered the appellant as a compli-
ance therewith, it will be observed there is no exact corre-
spondence between them, except in the instances of the note
of T. C. and Frances Noyes. It was abundantly shown, how-
ever, that the bank did not hold the notes described in the
guaranty, or any other or different notes against T. C. Noyes
and the interests he represented than the notes tendered, ex-
cept the note for $25,000, and the personal note of
T. C. Noyes for $2,000 before mentioned. Of these notes, it
was clearly not the intention of the parties to the agreement
that the note owing by the mining company itself to the
Nome bank should be taken up and the collaterals by which
it was secured assigned to the appellant. But it is clear that

the note of T. C. Noyes for $2,000 was to be so taken up; in fact, it is one of the two notes that were correctly described in the guaranty. Why it was not tendered to the appellant, the evidence fails to make clear, but apparently the reason was that the Nome bank at the time it made the application of the money paid it by the appellant had no very definite knowledge of the terms of the guaranty.

The trial judge, in a memorandum filed shortly after the close of the trial, rested his judgment on the ground that there had been a substantial compliance with the terms of the guaranty. In his formal findings made later, he added the additional reason that the guaranty was invalid for want of consideration. It has seemed to us, however, that the judgment cannot rest on either of these grounds. To constitute a substantial compliance with the guaranty, all of the notes that were correctly described therein with their collaterals should at least have been turned over, and, as we have shown, one of such notes was not so turned over. The second reason is untenable, as plainly the guaranty was founded on a sufficient consideration. The appellant parted with the sum of $15,000 on the faith of the promise contained in the guaranty, and a detriment to the promisee is as much a consideration as is a benefit to the promisor.

But we think, nevertheless, that the judgment was right. The contract was not indivisible. It contains no promise to return the money advanced in the case the notes and securities are not delivered in their entirety. In this respect, it does not differ from an ordinary contract. The promise implied by the agreement is that the promisor will make good any losses suffered by the promisee by reason of a failure to perform the contract. It is plain from the recitals we have made that the appellant had two objects in making the advancements. The first, and perhaps the principal one, was to stay the hand of the Nome Bank & Trust Company with reference to the collaterals held by it. It was desired that

14—76 WASH.

no sale of these might be made by the bank as it might put the control of the mining company in the hands of strangers, and thus cause a loss of not only the interests the appellant and her son had therein but the very considerable sums they had advanced in its promotion. The second reason was to secure individual control of these notes and collaterals that she might better secure a return of the money advanced. The major part of these purposes was fulfilled. The appellant not only succeeded in stopping a sale of the collaterals, but secured, or could have secured, the greater part of the notes and collaterals agreed to be turned over to her.

Her remedy was, therefore, as she correctly conceived, an action in damages for a breach of the contract, but her measure of damages was not, as she seems to have incorrectly conceived, a return of the entire sum advanced. She was entitled to recover her actual losses and no more. As to what these were, the record is silent. True, it was shown that the mining adventure failed and that the collaterals which consisted of its capital stock lost their value. But this was not the fault of the respondent. He did not guarantee the success of the mining adventure, and in so far as losses were caused by this fact, they must be borne by the appellant who assumed the risk. The only tangible asset described in the guaranty capable of being measured and which was not tendered, was the note of T. C. Noyes for $2,000. But there was evidence to the effect that Noyes was insolvent, and this we think overcomes the presumption that perhaps arises from the execution and delivery of the note, namely, that the maker of the note is able to make good the promise contained therein. The record, therefore, shows nothing more than the execution of a contract and its partial breach. While this in some instances would show a right to nominal damages, it is not so in this character of action. The rule in this jurisdiction is that, in an action for damages, the object of which is to recover damages only, a failure to prove substantial

damages is a failure to prove the substance of the issue, entitling the defendant to a judgment.

The record is long, and in the foregoing we have given only its most salient features. Without, however, pursuing the subject further, we conclude that the judgment is in accord with the evidence, and should be affirmed. It is so ordered.

MOUNT, ELLIS, and MAIN, JJ., concur.